# VACA ET AL. *v.* SIPES, ADMINISTRATOR.

No. 114.   Argued November 17, 1966.—Decided February 27, 1967.

· *David E. Feller* argued the cause for petitioners. With him on the brief were *Henry A. Panethiere, Russell D. Jacobson, Jerry D. Anker* and *George G. West.*

*Allan R. Browne* argued the cause and filed a brief for respondent.

Briefs of *amici curiae*, urging reversal, were filed by *Solicitor General Marshall, Robert S. Rifkind, Arnold*

*Ordman, Dominick L. Manoli* and *Norton J. Come* for the United States; by *J. Albert Woll, Robert C. Mayer, Laurence Gold* and *Thomas E. Harris* for the American Federation of Labor and Congress of Industrial Organizations; and by *Robert L. Hecker* and *Earl G. Spiker* for Swift & Co.

MR. JUSTICE WHITE delivered the opinion of the Court.

On February 13, 1962, Benjamin Owens filed this class action against petitioners, as officers and representatives of the National Brotherhood of Packinghouse Workers [1] and of its Kansas City Local No. 12 (the Union), in the Circuit Court of Jackson County, Missouri. Owens, a Union member, alleged that he had been discharged from his employment at Swift & Company's (Swift) Kansas City Meat Packing Plant in violation of the collective bargaining agreement then in force between Swift and the Union, and that the Union had "arbitrarily, capriciously and without just or reasonable reason or cause" refused to take his grievance with Swift to arbitration under the fifth step of the bargaining agreement's grievance procedures.

Petitioners' answer included the defense that the Missouri courts lacked jurisdiction because the gravamen of Owens' suit was "arguably and basically" an unfair labor practice under § 8 (b) of the National Labor Relations Act (N. L. R. A.), as amended, 61 Stat. 141, 29 U. S. C. § 158 (b), within the exclusive jurisdiction of the National Labor Relations Board (NLRB). After a jury trial, a verdict was returned awarding Owens $7,000 compensatory and $3,300 punitive damages. The trial judge set aside the verdict and entered judgment for petitioners on the ground that the NLRB had exclusive jurisdiction

[1] Now known as the National Brotherhood of Packinghouse & Dairy Workers.

over this controversy, and the Kansas City Court of Appeals affirmed. The Supreme Court of Missouri reversed and directed reinstatement of the jury's verdict,[2] relying on this Court's decisions in *International Assn. of Machinists* v. *Gonzales*, 356 U. S. 617, and in *Automobile Workers* v. *Russell*, 356 U. S. 634. 397 S. W. 2d 658. During the appeal, Owens died, and respondent, the administrator of Owens' estate, was substituted. We granted certiorari to consider whether exclusive jurisdiction lies with the NLRB and, if not, whether the finding of Union liability and the relief afforded Owens are consistent with governing principles of federal labor law. 384 U. S. 969. The American Federation of Labor and Congress of Industrial Organizations (AFL–CIO), Swift, and the United States have filed *amicus* briefs supporting petitioners. Although we conclude that state courts have jurisdiction in this type of case, we hold that federal law governs, that the governing federal standards were not applied here, and that the judgment of the Supreme Court of Missouri must accordingly be reversed.

## I.

In mid-1959, Owens, a long-time high blood pressure patient, became sick and entered a hospital on sick leave from his employment with Swift. After a long rest during which his weight and blood pressure were reduced, Owens was certified by his family physician as fit to resume his heavy work in the packing plant. However, Swift's company doctor examined Owens upon his return and concluded that his blood pressure was too high to permit reinstatement. After securing a second authorization from another outside doctor, Owens returned to the plant, and a nurse permitted him to resume work

---

[2] Punitive damages were reduced to $3,000, the amount claimed by Owens in his complaint.

on January 6, 1960. However, on January 8, when the doctor discovered Owens' return, he was permanently discharged on the ground of poor health.

Armed with his medical evidence of fitness, Owens then sought the Union's help in securing reinstatement, and a grievance was filed with Swift on his behalf. By mid-November 1960, the grievance had been processed through the third and into the fourth step of the grievance procedure established by the collective bargaining agreement.[3] Swift adhered to its position that Owens' poor health justified his discharge, rejecting numerous medical reports of reduced blood pressure proffered by Owens and by the Union. Swift claimed that these reports were not based upon sufficiently thorough medical tests.

On February 6, 1961, the Union sent Owens to a new doctor at Union expense "to see if we could get some better medical evidence so that we could go to arbitration with his case." R., at 107. This examination did not support Owens' position. When the Union received the report, its executive board voted not to take the Owens grievance to arbitration because of insufficient medical evidence. Union officers suggested to Owens that he accept Swift's offer of referral to a rehabilitation center, and the grievance was suspended for that purpose. Owens rejected this alternative and demanded that the Union take his grievance to arbitration, but the Union

---

[3] The agreement created a five-step procedure for the handling of grievances. In steps one and two, either the aggrieved employee or the Union's representative presents the grievance first to Swift's department foreman, and then in writing to the division superintendent. In step three, grievance committees of the Union and management meet, and the company must state its position in writing to the Union. Step four is a meeting between Swift's general superintendent and representatives of the National Union. If the grievance is not settled in the fourth step, the National Union is given power to refer the grievance to a specified arbitrator.

refused. With his contractual remedies thus stalled at the fourth step, Owens brought this suit. The grievance was finally dismissed by the Union and Swift shortly before trial began in June 1964.[4]

In his charge to the jury, the trial judge instructed that petitioners would be liable if Swift had wrongfully discharged Owens and if the Union had "arbitrarily . . . and without just cause or excuse . . . refused" to press Owens' grievance to arbitration. Punitive damages could also be awarded, the trial judge charged, if the Union's conduct was "willful, wanton and malicious." However, the jury must return a verdict for the defendants, the judge instructed, "if you find and believe from the evidence that the union and its representatives acted reasonably and in good faith in the handling and processing of the grievance of the plaintiff." R., at 161–162. The jury then returned the general verdict for Owens which eventually was reinstated by the Missouri Supreme Court.

## II.

Petitioners challenge the jurisdiction of the Missouri courts on the ground that the alleged conduct of the Union was arguably an unfair labor practice and within the exclusive jurisdiction of the NLRB. Petitioners rely on *Miranda Fuel Co.*, 140 N. L. R. B. 181 (1962), enforcement denied, 326 F. 2d 172 (C. A. 2d Cir. 1963), where a sharply divided Board held for the first time that a union's breach of its statutory duty of fair representation violates N. L. R. A. § 8 (b), as amended. With the NLRB's adoption of *Miranda Fuel*, petitioners argue, the broad pre-emption doctrine defined in *San Diego Building Trades Council v. Garmon*, 359 U. S. 236, be-

---

[4] No notice of the dismissal was given to Owens, who by that time had filed a second suit against Swift for breach of contract. The suit against Swift is still pending in a pretrial stage.

comes applicable. For the reasons which follow, we reject this argument.

It is now well established that, as the exclusive bargaining representative of the employees in Owens' bargaining unit, the Union had a statutory duty fairly to represent all of those employees, both in its collective bargaining with Swift, see *Ford Motor Co.* v. *Huffman,* 345 U. S. 330; *Syres* v. *Oil Workers International Union,* 350 U. S. 892, and in its enforcement of the resulting collective bargaining agreement, see *Humphrey* v. *Moore,* 375 U. S. 335. The statutory duty of fair representation was developed over 20 years ago in a series of cases involving alleged racial discrimination by unions certified as exclusive bargaining representatives under the Railway Labor Act, see *Steele* v. *Louisville & N. R. Co.,* 323 U. S. 192; *Tunstall* v. *Brotherhood of Locomotive Firemen,* 323 U. S. 210, and was soon extended to unions certified under the N. L. R. A., see *Ford Motor Co.* v. *Huffman, supra.* Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct. *Humphrey* v. *Moore,* 375 U. S., at 342. It is obvious that Owens' complaint alleged a breach by the Union of a duty grounded in federal statutes, and that federal law therefore governs his cause of action. *E. g., Ford Motor Co.* v. *Huffman, supra.*

Although N. L. R. A. § 8 (b) was enacted in 1947, the NLRB did not until *Miranda Fuel* interpret a breach of a union's duty of fair representation as an unfair labor practice. In *Miranda Fuel,* the Board's majority held that N. L. R. A. § 7 gives employees "the right to be free from unfair or irrelevant or invidious treatment by their exclusive bargaining agent in matters affecting their

employment," and "that Section 8 (b)(1)(A) of the Act accordingly prohibits labor organizations, when acting in a statutory representative capacity, from taking action against any employee upon considerations or classifications which are irrelevant, invidious, or unfair." 140 N. L. R. B., at 185. The Board also held that an employer who "participates" in such arbitrary union conduct violates § 8 (a)(1), and that the employer and the union may violate §§ 8 (a)(3) and 8 (b)(2), respectively, "when, for arbitrary or irrelevant reasons or upon the basis of an unfair classification, the union attempts to cause or does cause an employer to derogate the employment status of an employee." [5]  *Id.*, at 186.

The Board's *Miranda Fuel* decision was denied enforcement by a divided Second Circuit, 326 F. 2d 172 (1963). However, in ·*Local 12, United Rubber Workers* v. *N. L. R. B.*, 368 F. 2d 12, the Fifth Circuit upheld the Board's *Miranda Fuel* doctrine in an opinion suggesting that the Board's approach will pre-empt judicial cognizance of some fair representation duty suits. In light of these developments, petitioners argue that Owens' state court action was based upon Union conduct that is arguably proscribed by N. L. R. A. § 8 (b), was potentially enforceable by the NLRB, and was therefore pre-empted under the *Garmon* line of decisions.

A. In *Garmon*, this Court recognized that the broad powers conferred by Congress upon the National Labor Relations Board to interpret and to enforce the complex Labor Management Relations Act (L. M. R. A.) necessarily imply that potentially conflicting "rules of law, of remedy, and of administration" cannot be permitted to

---

[5] See also *Cargo Handlers, Inc.*, 159 N. L. R. B. No. 17; *Local 12, United Rubber Workers*, 150 N. L. R. B. 312, enforced, 368 F. 2d 12 (C. A. 5th Cir. 1966); *Maremont Corp.*, 149 N. L. R. B. 482; *Galveston Maritime Assn., Inc.*, 148 N. L. R. B. 897; *Hughes Tool Co.*, 147 N. L. R. B. 1573.

operate. 359 U. S., at 242. In enacting the National Labor Relations Act and later the Labor Management Relations Act,

> "Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal·. . . . Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and· to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies. . . . A multiplicity· of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law." *Garner* v. *Teamsters Union,* 346 U. S. 485, 490–491.

Consequently, as a general rule, neither state nor federal courts have jurisdiction over suits directly involving "activity [which] is arguably subject to § 7 or § 8 of the Act." *San Diego Building Trades Council* v. *Garmon,* 359 U. S., at 245.

This pre-emption doctrine, however, has never been rigidly applied to cases where it could not fairly be inferred that Congress intended exclusive jurisdiction to lie with the NLRB. Congress itself has carved out exceptions to the Board's exclusive jurisdiction: Section 303 of the Labor Management Relations Act, 1947, 61 Stat. 158, 29 U. S. C. § 187, expressly permits anyone injured by a violation of N. L. R. A. § 8 (b)(4) to recover damages in a federal court even though such unfair labor practices are also remediable by the Board; § 301 of that Act, 61 Stat. 156, 29 U. S. C. § 185, permits suits for breach of a collec-

tive bargaining agreement regardless of whether the particular breach is also an unfair labor practice within the jurisdiction of the Board (see *Smith* v. *Evening News Assn.,* 371 U. S. 195); and N. L. R. A. § 14, as amended by Title VII, § 701 (a) of the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 541, 29 U. S. C. § 164 (c), permits state agencies and courts to assume jurisdiction "over labor disputes over which the Board declines, pursuant to paragraph (1) of this subsection, to assert jurisdiction" (compare *Guss* v. *Utah Labor Board,* 353 U. S. 1).

In addition to these congressional exceptions, this Court has refused to hold state remedies pre-empted "where the activity regulated was a merely peripheral concern of the Labor Management Relations Act . . . . [or] touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress has deprived the States of the power to act." *San Diego Building Trades Council* v. *Garmon,* 359 U. S., at 243–244. See, *e. g., Linn* v. *Plant Guard Workers,* 383 U. S. 53 (libel); *Automobile Workers* v. *Russell,* 356 U. S. 634 (violence); *International Assn. of Machinists* v. *Gonzales,* 356 U. S. 617 (wrongful expulsion from union membership); *Allen-Bradley Local* v. *Wisconsin Employment Relations Board,* 315 U. S. 740 (mass picketing). See also *Hanna Mining Co.* v. *Marine Engineers Beneficial Assn.,* 382 U. S. 181. While these exceptions in no way undermine the vitality of the pre-emption rule where applicable, they demonstrate that the decision to pre-empt federal and state court jurisdiction over a given class of cases must depend upon the nature of the particular interests being asserted and the effect upon the administration of national labor policies of concurrent judicial and administrative remedies.

A primary justification for the pre-emption doctrine— the need to avoid conflicting rules of substantive law

in the labor relations area and the desirability of leaving the development of such rules to the administrative agency created by Congress for that purpose—is not applicable to cases involving alleged breaches of the union's duty of fair representation. The doctrine was judicially developed in *Steele* and its progeny, and suits alleging breach of the duty remained judicially cognizable long after the NLRB was given unfair labor practice jurisdiction over union activities by the L. M. R. A.[6] Moreover, when the Board declared in *Miranda Fuel* that a union's breach of its duty of fair representation would henceforth be treated as an unfair labor practice, the Board adopted and applied the doctrine as it had been developed by the federal courts. See 140 N. L. R. B., at 184–186. Finally, as the dissenting Board members in *Miranda Fuel* have pointed out, fair representation duty suits often require review of the substantive positions taken and policies pursued by a union in its negotiation of a collective bargaining agreement and in its handling of the grievance machinery; as these matters are not normally within the Board's unfair labor practice jurisdiction, it can be doubted whether the Board brings substantially greater expertise to bear on these problems than do the courts, which have been engaged in this type of review since the *Steele* decision.[7]

In addition to the above considerations, the unique interests served by the duty of fair representation doc-

[6] See *Ford Motor Co.* v. *Huffman*, 345 U. S. 330, 332, n. 4. In *Huffman*, the NLRB submitted an *amicus* brief stating that it had not assumed pre-emptive jurisdiction over fair representation duty issues. Mem. for the NLRB, Nos. 193 and 194, Oct. Term, 1952. In *Syres* v. *Oil Workers International Union*, 350 U. S. 892, the Court reversed the dismissal of a suit which claimed breach of the duty of fair representation despite express reliance by one respondent on exclusive NLRB jurisdiction. Brief for Resp. Gulf Oil Corp., No. 390, Oct. Term, 1955.

[7] See *Hughes Tool Co.*, 147 N. L. R. B. 1573, 1589–1590 (Chairman McCulloch and Member Fanning, dissenting in part).

trine have a profound effect, in our opinion, on the applicability of the pre-emption rule to this class of cases. The federal labor laws seek to promote industrial peace and the improvement of wages and working conditions by fostering a system of employee organization and collective bargaining. See N. L. R. A. § 1, as amended, 61 Stat. 136, 29 U. S. C. § 151. The collective bargaining system as encouraged by Congress and administered by the NLRB of necessity subordinates the interests of an individual employee to the collective interests of all employees in a bargaining unit. See, *e. g., J. I. Case Co.* v. *Labor Board,* 321 U. S. 332. This Court recognized in *Steele* that the congressional grant of power to a union to act as exclusive collective bargaining representative, with its corresponding reduction in the individual rights of the employees so represented, would raise grave constitutional problems if unions were free to exercise this power to further racial discrimination. 323 U. S., at 198–199. Since that landmark decision, the duty of fair representation has stood as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law. Were we to hold, as petitioners and the Government urge, that the courts are foreclosed by the NLRB's *Miranda Fuel* decision from this traditional supervisory jurisdiction, the individual employee injured by arbitrary or discriminatory union conduct could no longer be assured of impartial review of his complaint, since the Board's General Counsel has unreviewable discretion to refuse to institute an unfair labor practice complaint. See *United Electrical Contractors Assn.* v. *Ordman,* 366 F. 2d 776, cert. denied, 385 U. S. 1026.[8] The existence of even a small group

---

[8] The public interest in effectuating the policies of the federal labor laws, not the wrong done the individual employee, is always the Board's principal concern in fashioning unfair labor practice remedies. See N. L. R. A. § 10 (c), as amended, 61 Stat. 147, 29 U. S. C.

of cases in which the Board would be unwilling or unable to remedy a union's breach of duty would frustrate the basic purposes underlying the duty of fair representation doctrine. For these reasons, we cannot assume from the NLRB's tardy assumption of jurisdiction in these cases that Congress, when it enacted N. L. R. A. § 8 (b) in 1947, intended to oust the courts of their traditional jurisdiction to curb arbitrary conduct by the individual employee's statutory representative.

B. There are also some intensely practical considerations which foreclose pre-emption of judicial cognizance of fair representation duty suits, considerations which emerge from the intricate relationship between the duty of fair representation and the enforcement of collective bargaining contracts. For the fact is that the question of whether a union has breached its duty of fair representation will in many cases be a critical issue in a suit under L. M. R. A. § 301 charging an employer with a breach of contract. To illustrate, let us assume a collective bargaining agreement that limits discharges to those for good cause and that contains no grievance, arbitration or other provisions purporting to restrict access to the courts. If an employee is discharged without cause, either the union or the employee may sue the employer under L. M. R. A. § 301. Under this section, courts have jurisdiction over suits to enforce collective bargaining agreements even though the conduct of the employer which is challenged as a breach of contract is also arguably an unfair labor practice within the jurisdiction of

§ 160 (c); *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177. Thus, the General Counsel will refuse to bring complaints on behalf of injured employees where the injury complained of is "insubstantial." See Administrative Decision of the General Counsel, Case No. K–610, Aug. 13, 1956, in CCH N. L. R. B. Decisions, 1956–1957, Transfer Binder, ¶ 54,059.

the NLRB. *Garmon* and like cases have no application to § 301 suits. *Smith* v. *Evening News Assn.*, 371 U. S. 195.

The rule is the same with regard to pre-emption where the bargaining agreement contains grievance and arbitration provisions which are intended to provide the exclusive remedy for breach of contract claims.[9] If an employee is discharged without cause in violation of such an agreement, that the employer's conduct may be an unfair labor practice does not preclude a suit by the union[10] against the employer to compel arbitration of the employee's grievance, the adjudication of the claim by the arbitrator, or a suit to enforce the-resulting arbitration award. See, *e. g., Steelworkers* v. *American Mfg. Co.*, 363 U. S. 564.

However, if the wrongfully discharged employee himself resorts to the courts before the grievance procedures have been fully exhausted, the employer may well defend on the ground that the exclusive remedies provided by such a contract have not been exhausted. Since the employee's claim is based upon breach of the collective bargaining agreement, he is bound by terms of that agreement which govern the manner in which contractual rights may be enforced. For this reason, it is settled that the employee must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement. *Republic Steel Corp.* v. *Maddox*, 379 U. S.

---

[9] If a grievance and arbitration procedure is included in the contract, but the parties do not intend it to be an exclusive remedy, then a suit for breach of contract will normally be heard even though such procedures have not been exhausted. See *Republic Steel Corp.* v. *Maddox*, 379 U. S. 650, 657–658; 6A Corbin, Contracts § 1436 (1962).

[10] Occasionally, the bargaining agreement will give the aggrieved employee, rather than his union, the right to invoke arbitration. See *Retail Clerks* v. *Lion Dry Goods, Inc.*, 341 F. 2d 715, cert. denied, 382 U. S. 839.

650. However, because these contractual remedies. have been devised and are often controlled by the union and the employer, they may well prove unsatisfactory or unworkable for the individual grievant. The problem then is to determine under what circumstances the individual employee may obtain judicial review of his breach-of-contract claim despite his failure to secure relief through the contractual remedial procedures.

An obvious situation in which the employee should not be limited to the exclusive remedial procedures established by the contract occurs when the conduct of the employer amounts to a repudiation of those contractual procedures. Cf. *Drake Bakeries* v. *Bakery Workers,* 370 U. S. 254, 260–263. See generally 6A Corbin, Contracts § 1443 (1962). In such a situation (and there may of course be others), the employer is estopped by his own conduct to rely on the unexhausted grievance and arbitration procedures as a defense to the employee's cause of action.

We think that another situation when the employee may seek judicial enforcement of his contractual rights arises if, as is true here, the union has sole power under the contract to invoke the higher stages of the grievance procedure, *and* if, as is alleged here, the employee-plaintiff has been prevented from exhausting his contractual remedies by the union's *wrongful* refusal to process the grievance. It is true that the employer in such a situation may have done nothing to prevent exhaustion of the exclusive contractual remedies to which he agreed in the collective bargaining agreement. But the employer has committed a wrongful discharge in breach of that agreement, a breach which could be remedied through the grievance process to the employee-plaintiff's benefit were it not for the union's breach of its statutory duty of fair representation to the employee. To leave the employee remediless in such circumstances would, in our

opinion, be a great injustice. We cannot believe that Congress, in conferring upon employers and unions the power to establish exclusive grievance procedures, intended to confer upon unions such unlimited discretion to deprive injured employees of all remedies for breach of contract. Nor do we think that Congress intended to shield employers from the natural consequences of their breaches of bargaining agreements by wrongful union conduct in the enforcement of such agreements. Cf. *Richardson* v. *Texas & N. O. R. Co.*, 242 F. 2d 230, 235–236 (C. A. 5th Cir.).

For these reasons, we think the wrongfully discharged employee may bring an action against his employer in the face of a defense based upon the failure to exhaust contractual remedies, provided the employee can prove that the union as bargaining agent breached its duty of fair representation in its handling of the employee's grievance.[11] We may assume for present purposes that such a breach of duty by the union is an unfair labor practice, as the NLRB and the Fifth Circuit have held. The employee's suit against the employer, however, remains a § 301 suit, and the jurisdiction of the courts is no more destroyed by the fact that the employee, as part and parcel of his § 301 action, finds it necessary to prove an unfair labor practice by the union, than it is by the fact that the suit may involve an unfair labor practice by the employer himself. The court is free to determine

---

[11] Accord, *Hiller* v. *Liquor Salesmen's Union*, 338 F. 2d 778 (C. A. 2d Cir.); *Hardcastle* v. *Western Greyhound Lines*, 303 F. 2d 182 (C. A. 9th Cir.), cert. denied, 371 U. S. 920; *Fiore* v. *Associated Transport, Inc.*, 255 F. Supp. 596; *Bieski* v. *Eastern Automobile Forwarding Co.*, 231 F. Supp. 710, aff'd, 354 F. 2d 414 (C. A. 3d Cir.); *Ostrofsky* v. *United Steelworkers*, 171 F. Supp. 782, aff'd per curiam, 273 F. 2d 614 (C. A. 4th Cir.), cert. denied, 363 U. S. 849; *Jenkins* v. *Wm. Schluderberg-T. J. Kurdle Co.*, 217 Md. 556, 144 A. 2d 88.

whether the employee is barred by the actions of his union representative, and, if not, to proceed with the case. And if, to facilitate his case, the employee joins the union as a defendant, the situation is not substantially changed. The action is still a § 301 suit, and the jurisdiction of the courts is not pre-empted under the *Garmon* principle. This, at the very least, is the holding of *Humphrey* v. *Moore, supra,* with respect to pre-emption, as petitioners recognize in their brief. And, insofar as adjudication of the union's breach of duty is concerned, the result should be no different if the employee, as Owens did here, sues the employer and the union in separate actions. There would be very little to commend a rule which would permit the Missouri courts to adjudicate the Union's conduct in an action against Swift but not in an action against the Union itself.

For the above reasons, it is obvious that the courts will be compelled to pass upon whether there has been a breach of the duty of fair representation in the context of many § 301 breach-of-contract actions. If a breach of duty by the union and a breach of contract by the employer are proven, the court must fashion an appropriate remedy. Presumably, in at least some cases, the union's breach of duty will have enhanced or contributed to the employee's injury. What possible sense could there be in a rule which would permit a court that has litigated the fault of employer and union to fashion a remedy only with respect to the employer? Under such a rule, either the employer would be compelled by the court to pay for the union's wrong—slight deterrence, indeed, to future union misconduct—or the injured employee would be forced to go to two tribunals to repair a single injury. Moreover, the Board would be compelled in many cases either to remedy injuries arising out of a breach of contract, a task which Congress has not assigned to it, or to leave the individual employee with-

out remedy for the union's wrong.[12]  Given the strong reasons for not pre-empting duty of fair representation suits in general, and the fact that the courts in many § 301 suits must adjudicate whether the union has breached its duty, we conclude that the courts may also fashion remedies for such a breach of duty.

It follows from the above that the Missouri courts had jurisdiction in this case.  Of course, it is quite another problem to determine what remedies may be available against the Union if a breach of duty is proven.  See Part IV, *infra*.  But the unique role played by the duty of fair representation doctrine in the scheme of federal labor laws, and its important relationship to the judicial enforcement of collective bargaining agreements in the context presented here, render the *Garmon* pre-emption doctrine inapplicable.

## III.

Petitioners contend, as they did in their motion for judgment notwithstanding the jury's verdict, that Owens failed to prove that the Union breached its duty of fair representation in its handling of Owens' grievance.  Peti-

---

[12] Assuming for the moment that Swift breached the collective bargaining agreement in discharging Owens and that the Union breached its duty in handling Owens' grievance, this case illustrates the difficulties that would result from a rule pre-empting the courts from remedying the Union's breach of duty.  If Swift did not "participate" in the Union's unfair labor practice, the Board would have no jurisdiction to remedy Swift's breach of contract.  Yet a court might be equally unable to give Owens full relief in a § 301 suit against Swift.  Should the court award damages against Swift for Owens' full loss, even if it concludes that part of that loss was caused by the Union's breach of duty?  Or should it award Owens only partial recovery hoping that the Board will make him whole?  These remedy problems are difficult enough when one tribunal has all parties before it; they are impossible if two independent tribunals, with different procedures, time limitations, and remedial powers, must participate.

tioners also argue that the Supreme Court of Missouri, in rejecting this contention, applied a standard that is inconsistent with governing principles of federal law with respect to the Union's duty to an individual employee in its processing of grievances under the collective bargaining agreement with Swift. We agree with both contentions.

A. In holding that the evidence at trial supported the jury's verdict in favor of Owens, the Missouri Supreme Court stated:

> "The essential issue submitted to the jury was whether the union . . . arbitrarily . . . refused to carry said grievance . . . through the fifth step . . . .
>
> "We have concluded that there was sufficient substantial evidence from which the jury reasonably could have found the foregoing issue in favor of plaintiff. It is notable that no physician actually testified in the case. Both sides were content to rely upon written statements. Three physicians certified that plaintiff was able to perform his regular work. Three other physicians certified that they had taken plaintiff's blood pressure and that the readings were approximately 160 over 100. It may be inferred that such a reading does not indicate that his blood pressure was dangerously high. Moreover, plaintiff's evidence showed that he had actually done hard physical labor periodically during the four years following his discharge. We accordingly rule this point adversely to defendants." 397 S. W. 2d, at 665.

Quite obviously, the question which the Missouri Supreme Court thought dispositive of the issue of liability was whether the evidence supported Owens' assertion that he had been wrongfully discharged by Swift, regardless of the Union's good faith in reaching a contrary

conclusion. This was also the major concern of the plaintiff at trial: the bulk of Owens' evidence was directed at whether he was medically fit at the time of discharge and whether he had performed heavy work after that discharge.

A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith. See *Humphrey* v. *Moore, supra*; *Ford Motor Co.* v. *Huffman, supra*. There has been considerable debate over the extent of this duty in the context of a union's enforcement of the grievance and arbitration procedures in a collective bargaining agreement. See generally Blumrosen, The Worker and Three Phases of Unionism: Administrative and Judicial Control of the Worker-Union Relationship, 61 Mich. L. Rev. 1435, 1482–1501 (1963); Comment, Federal Protection of Individual Rights under Labor Contracts, 73 Yale L. J. 1215 (1964). Some have suggested that every individual employee should have the right to have his grievance taken to arbitration.[13] Others have urged that the union be given substantial discretion (if the collective bargaining agreement so provides) to decide whether a grievance should be taken to arbitration, subject only to the duty to refrain from patently wrongful conduct such as racial discrimination or personal hostility.[14]

---

[13] See *Donnelly* v. *United Fruit Co.*, 40 N. J. 61, 190 A. 2d 825; Report of Committee on Improvement of Administration of Union-Management Agreements, 1954, Individual Grievances, 50 Nw. U. L. Rev. 143 (1955); Murphy, The Duty of Fair Representation under Taft-Hartley, 30 Mo. L. Rev. 373, 389 (1965); Summers, Individual Rights in Collective Agreements and Arbitration, 37 N. Y. U. L. Rev. 362 (1962).

[14] See *Sheremet* v. *Chrysler Corp.*, 372 Mich. 626, 127 N. W. 2d 313; Wyle, Labor Arbitration and the Concept of Exclusive Representation, 7 B. C. Ind. & Com. L. Rev. 783 (1966).

Though we accept the proposition that a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion, we do not agree that the individual employee has an absolute right to have his grievance taken to arbitration regardless of the provisions of the applicable collective bargaining agreement. In L. M. R. A. § 203 (d), 61 Stat. 154, 29 U. S. C. § 173 (d), Congress declared that "Final adjustment by a method agreed upon by the parties is . . . the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement." In providing for a grievance and arbitration procedure which gives the union discretion to supervise the grievance machinery and to invoke arbitration, the employer and the union contemplate that each will endeavor in good faith to settle grievances short of arbitration. Through this settlement process, frivolous grievances are ended prior to the most costly and time-consuming step in the grievance procedures. Moreover, both sides are assured that similar complaints will be treated consistently, and major problem areas in the interpretation of the collective bargaining contract can be isolated and perhaps resolved. And finally, the settlement process furthers the interest of the union as statutory agent and as coauthor of the bargaining agreement in representing the employees in the enforcement of that agreement. See Cox, Rights Under a Labor Agreement, 69 Harv. L. Rev. 601 (1956).

If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation. Moreover, under such a rule, a significantly greater number of grievances would proceed to

arbitration.[15]   This would greatly increase the cost of the grievance machinery and could so overburden the arbitration process as to prevent it from functioning successfully.  See *NLRB* v. *Acme Industrial Co.*, 385 U. S. 432, 438; Ross, Distressed Grievance Procedures and Their Rehabilitation, in Labor Arbitration and Industrial Change, Proceedings of the 16th Annual Meeting, National Academy of Arbitrators 104 (1963).  It can well be doubted whether the parties to collective bargaining agreements would long continue to provide for detailed grievance and arbitration procedures of the kind encouraged by L. M. R. A. § 203 (d), *supra,* if their power to settle the majority of grievances short of the costlier and more time-consuming steps was limited by a rule permitting the grievant unilaterally to invoke arbitration. Nor do we see substantial danger to the interests of the individual employee if his statutory agent is given the contractual power honestly and in good faith to settle grievances short of arbitration.  For these reasons, we conclude that a union does not breach its duty of fair representation, and thereby open up a suit by the employee for breach of contract, merely because it settled the grievance short of arbitration.

For these same reasons, the standard applied here by the Missouri Supreme Court cannot be sustained.  For if a union's decision that a particular grievance lacks

---

[15] Under current grievance practices, an attempt is usually made to keep the number of arbitrated grievances to a minimum.  An officer of the National Union testified in this case that only one of 967 grievances filed at all of Swift's plants between September 1961 and October 1963 was taken to arbitration.  And the AFL–CIO's *amicus* brief reveals similar performances at General Motors Corporation and United States Steel Corporation, two of the Nation's largest unionized employers: less than .05% of all written grievances filed during a recent period at General Motors required arbitration, while only 5.6% of the grievances processed beyond the first step at United States Steel were decided by an arbitrator.

sufficient merit to justify arbitration would constitute a breach of the duty of fair representation because a judge or jury later found the grievance meritorious, the union's incentive to settle such grievances short of arbitration would be seriously reduced. The dampening effect on the entire grievance procedure of this reduction of the union's freedom to settle claims in good faith would surely be substantial. Since the union's statutory duty of fair representation protects the individual employee from arbitrary abuses of the settlement device by providing him with recourse against both employer (in a § 301 suit) and union, this severe limitation on the power to settle grievances is neither necessary nor desirable. Therefore, we conclude that the Supreme Court of Missouri erred in upholding the verdict in this case solely on the ground that the evidence supported Owens' claim that he had been wrongfully discharged.

B. Applying the proper standard of union liability to the facts of this case, we cannot uphold the jury's award, for we conclude that as a matter of federal law the evidence does not support a verdict that the Union breached its duty of fair representation. As we have stated, Owens could not have established a breach of that duty merely by convincing the jury that he was in fact fit for work in 1960; he must also have proved arbitrary or bad-faith conduct on the part of the Union in processing his grievance. The evidence revealed that the Union diligently supervised the grievance into the fourth step of the bargaining agreement's procedure, with the Union's business representative serving as Owens' advocate throughout these steps. When Swift refused to reinstate Owens on the basis of his medical reports indicating reduced blood pressure, the Union sent him to another doctor of his own choice, at Union expense, in an attempt to amass persuasive medical evidence of Owens' fitness for work. When this examination proved unfavorable, the Union

concluded that it could not establish a wrongful discharge. It then encouraged Swift to find light work for Owens at the plant. When this effort failed, the Union determined that arbitration would be fruitless and suggested to Owens that he accept Swift's offer to send him to a heart association for rehabilitation. At this point, Owens' grievance was suspended in the fourth step in the hope that he might be rehabilitated.

In administering the grievance and arbitration machinery as statutory agent of the employees, a union must, in good faith and in a nonarbitrary manner, make decisions as to the merits of particular grievances. See *Humphrey* v. *Moore,* 375 U. S. 335, 349–350; *Ford Motor Co.* v. *Huffman,* 345 U. S. 330, 337–339. In a case such as this, when Owens supplied the Union with medical evidence supporting his position, the Union might well have breached its duty had it ignored Owens' complaint or had it processed the grievance in a perfunctory manner. See Cox, Rights under a Labor Agreement, 69 Harv. L. Rev., at 632–634. But here the Union processed the grievance into the fourth step, attempted to gather sufficient evidence to prove Owens' case, attempted to secure for Owens less vigorous work at the plant, and joined in the employer's efforts to have Owens rehabilitated. Only when these efforts all proved unsuccessful did the Union conclude both that arbitration would be fruitless and that the grievance should be dismissed. There was no evidence that any Union officer was personally hostile to Owens or that the Union acted at any time other than in good faith.[16] Having concluded that

---

[16] Owens did allege and testify that petitioner Vaca, President of the Kansas City local, demanded $300 in expenses before the Union would take the grievance to arbitration, a charge which all the petitioners vigorously denied at trial. Under the collective bargaining agreement, the local union had no power to invoke arbitration. See n. 3, *supra.* Moreover, the Union's decision to send

the individual employee has no absolute right to have his grievance arbitrated under the collective bargaining agreement at issue, and that a breach of the duty of fair representation is not established merely by proof that the underlying grievance was meritorious, we must conclude that that duty was not breached here.

## IV.

In our opinion, there is another important reason why the judgment of the Missouri Supreme Court cannot stand. Owens' suit against the Union was grounded on his claim that Swift had discharged him in violation of the applicable collective bargaining agreement. In his complaint, Owens alleged "that, as a direct result of said wrongful breach of said contract, by employer . . . Plaintiff was damaged in the sum of Six Thousand, Five Hundred ($6,500.00) Dollars per year, continuing until the date of trial." For the Union's role in "preventing Plaintiff from completely exhausting administrative remedies," Owens requested, and the jury awarded, compensatory damages for the above-described breach of contract plus punitive damages of $3,000. R., at 4. We hold that such damages are not recoverable from the Union in the circumstances of this case.

The appropriate remedy for a breach of a union's duty of fair representation must vary with the circumstances of the particular breach. In this case, the employee's complaint was that the Union wrongfully failed to afford him the arbitration remedy against his employer established by the collective bargaining agreement. But the damages sought by Owens were primarily those suffered

---

Owens to another doctor at Union expense occurred after Vaca's alleged demand, and the ultimate decision not to invoke arbitration came later still. Thus, even if the jury believed Owens' controverted testimony, we do not think that this incident would establish a breach of duty by the Union.

because of the employer's alleged breach of contract. Assuming for the moment that Owens had been wrongfully discharged, Swift's only defense to a direct action for breach of contract would have been the Union's failure to resort to arbitration, compare *Republic Steel Corp.* v. *Maddox,* 379 U. S. 650, with *Smith* v. *Evening News Assn.,* 371 U. S. 195, and if that failure was itself a violation of the Union's statutory duty to the employee, there is no reason to exempt the employer from contractual damages which he would otherwise have had to pay. See pp. 185–186, *supra.* The difficulty lies in fashioning an appropriate scheme of remedies.

Petitioners urge that an employee be restricted in such circumstances to a decree compelling the employer and the union to arbitrate the underlying grievance.[17] It is true that the employee's action is based on the employer's alleged breach of contract plus the union's alleged wrongful failure to afford him his contractual remedy of arbitration. For this reason, an order compelling arbitration should be viewed as one of the available remedies when a breach of the union's duty is proved. But we see no reason inflexibly to require arbitration in all cases. In some cases, for example, at least part of the employee's damages may be attributable to the union's breach of duty, and an arbitrator may have no power under the bargaining agreement to award such damages against the union. In other cases, the arbitrable issues may be substantially resolved in the course of trying the fair representation controversy. In such situations, the court should be free to decide the contractual claim and to award the employee appropriate damages or equitable relief.

A more difficult question is, what portion of the employee's damages may be charged to the union: in partic-

---

[17] Obviously, arbitration is an appropriate remedy only when the parties have created such a procedure in the collective bargaining agreement.

ular, may an award against a union include, as it did here, damages attributable solely to the employer's breach of contract? We think not. Though the union has violated a statutory duty in failing to press the grievance, it is the employer's unrelated breach of contract which triggered the controversy and which caused this portion of the employee's damages. The employee should have no difficulty recovering these damages from the employer, who cannot, as we have explained, hide behind the union's wrongful failure to act; in fact, the employer may be (and probably should be) joined as a defendant in the fair representation suit, as in *Humphrey* v. *Moore, supra.* It could be a real hardship on the union to pay these damages, even if the union were given a right of indemnification against the employer. With the employee assured of direct recovery from the employer, we see no merit in requiring the union to pay the employer's share of the damages.[18]

The governing principle, then, is to apportion liability between the employer and the union according to the damage caused by the fault of each. Thus, damages attributable solely to the employer's breach of contract should not be charged to the union, but increases if any

---

[18] We are not dealing here with situations where a union has affirmatively caused the employer to commit the alleged breach of contract. In cases of that sort where the union's conduct is found to be an unfair labor practice, the NLRB has found an unfair labor practice by the employer, too, and has held the union and the employer jointly and severally liable for any back pay found owing to the particular employee who was the subject of their joint discrimination. *E. g., Imparato Stevedoring Corp.,* 113 N. L. R. B. 883 (1955); *Squirt Distrib. Co.,* 92 N. L. R. B. 1667 (1951); *H. M. Newman,* 85 N. L. R. B. 725 (1949). Even if this approach would be appropriate for analogous § 301 and breach-of-duty suits, it is not applicable here. Since the Union played no part in Swift's alleged breach of contract and since Swift took no part in the Union's alleged breach of duty, joint liability for either wrong would be unwarranted.

in those damages caused by the union's refusal to process the grievance should not be charged to the employer. In this case, even if the Union had breached its duty, all or almost all of Owens' damages would still be attributable to his allegedly wrongful discharge by Swift. For these reasons, even if the Union here had properly been found liable for a breach of duty, it is clear that the damage award was improper.

*Reversed.*

MR. JUSTICE FORTAS, with whom THE CHIEF JUSTICE and MR. JUSTICE HARLAN join, concurring in the result.

1. In my view, a complaint by an employee that the union has breached its duty of fair representation is subject to the exclusive jurisdiction of the NLRB. It is a charge of unfair labor practice. See *Miranda Fuel Co.*, 140 N. L. R. B. 181 (1962);[1] *Local 12, United Rubber Workers,* 150 N. L. R. B. 312, enforced, 368 F. 2d 12 (C. A. 5th Cir. 1966).[2] As is the case with most other

---

[1] This decision of the NLRB was denied enforcement by the Court of Appeals for the Second Circuit but on a basis which did not decide the point relevant here. *NLRB* v. *Miranda Fuel Co.,* 326 F. 2d 172 (C. A. 2d Cir. 1963). Only one judge, Judge Medina, took the position that the NLRB had incorrectly held violation of the duty of fair representation to be an unfair labor practice. As an alternative ground for decision, he held that the NLRB had not had sufficient evidence to support its finding of breach of the duty. Judge Lumbard agreed with this latter holding, and explicitly did not reach the question whether breach of the duty is an unfair labor practice. Judge Friendly dissented. He would have affirmed the NLRB both on the sufficiency of the evidence and on the holding that breach of the duty of fair representation is an unfair labor practice as to which the NLRB can give relief.

[2] The opinion by Judge Thornberry for the Fifth Circuit supports the views expressed herein. See also Cox, The Duty of Fair Representation, 2 Vill. L. Rev. 151, 172–173 (1957); Wellington, Union Democracy and Fair Representation: Federal Responsibility in a Federal System, 67 Yale L. J. 1327 (1958).

unfair labor practices, the Board's jurisdiction is pre-emptive. *Garner* v. *Teamsters Union,* 346 U. S. 485 (1953); *Guss* v. *Utah Labor Board,* 353 U. S. 1 (1957); *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236 (1959); *Local 438, Constr. Laborers* v. *Curry,* 371 U. S. 542 (1963); *Plumbers' Union* v. *Borden,* 373 U. S. 690 (1963); *Iron Workers* v. *Perko,* 373 U. S. 701 (1963); *Liner* v. *Jafco, Inc.,* 375 U. S. 301 (1964). Cf. *Woody* v. *Sterling Alum. Prods., Inc.,* 365 F. 2d 448 (C. A. 8th Cir. 1966), pet. for cert. pending, No. 946, O. T. 1966. There is no basis for failure to apply the pre-emption principle in the present case, and, as I shall discuss, strong reason for its application. The relationship between the union and the individual employee with respect to the processing of claims to employment rights under the collective bargaining agreement is fundamental to the design and operation of federal labor law. It is not "merely peripheral," as the Court's opinion states. It "presents difficult problems of definition of status, problems which we have held are precisely 'of a kind most wisely entrusted initially to the agency charged with the day-to-day administration of the Act as a whole.' " *Iron Workers* v. *Perko, supra,* 373 U. S., at 706. Accordingly, the judgment of the Supreme Court of Missouri should be reversed and the complaint dismissed for this reason and on this basis. I agree, however, that if it were assumed that jurisdiction of the subject matter exists, the judgment would still have to be reversed because of the use by the Missouri court of an improper standard for measuring the union's duty, and the absence of evidence to establish that the union refused further to process Owens' grievance because of bad faith or arbitrarily.

2. I regret the elaborate discussion in the Court's opinion of problems which are irrelevant. This is not an action by the employee against the employer, and the

discussion of the requisites of such an action is, in my judgment, unnecessary. The Court argues that the employee could sue the employer under L. M. R. A. § 301; and that to maintain such an action the employee would have to show that he has exhausted his remedies under the collective bargaining agreement, or alternatively that he was prevented from doing so because the union breached its duty to him by failure completely to process his claim. That may be; or maybe all he would have to show to maintain an action against the employer for wrongful discharge is that he demanded that the union process his claim to exhaustion of available remedies, and that it refused to do so.[3] I see no need for the Court to pass upon that question, which is not presented here, and which, with all respect, lends no support to the Court's argument. The Court seems to use its discussion of the employee-employer litigation as somehow analogous to or supportive of its conclusion that the employee may maintain a court action against the union. But I do not believe that this follows. I agree that the NLRB's unfair labor practice jurisdiction does not preclude an action under § 301 against the employer for wrongful discharge

---

[3] Cf. my Brother BLACK's dissenting opinion in this case. Cf. also *Brown* v. *Sterling Alum. Prods. Corp.,* 365 F. 2d 651, 656–657 (C. A. 8th Cir. 1966), cert. denied, *post,* p. 957. *Republic Steel Corp.* v. *Maddox,* 379 U. S. 650 (1965), does not pass upon the issue. The Court states that "To leave the employee remediless" when the union wrongfully refuses to process his grievance, "would . . . be a great injustice." I do not believe the Court relieves this injustice to any great extent by requiring the employee to prove an unfair labor practice as a prerequisite to judicial relief for the employer's breach of contract. Nor do I understand how giving the employee a cause of action against the *union* is an appropriate way to remedy the injustice which would exist if the union were allowed to foreclose relief against the *employer.*

from employment. *Smith* v. *Evening News Assn.*, 371 U. S. 195 (1962). Therefore, Owens might have maintained an action against his employer in the present case. This would be an action to enforce the collective bargaining agreement, and Congress has authorized the courts to entertain actions of this type. But his claim against the union is quite different in character, as the Court itself recognizes. The Court holds—and I think correctly if the issue is to be reached—that the union could not be required to pay damages measured by the breach of the employment contract, because it was not the union but the employer that breached the contract. I agree; but I suggest that this reveals the point for which I contend: that the employee's claim against the union is not a claim under the collective bargaining agreement, but a claim that the union has breached its statutory duty of fair representation. This claim, I submit, is a claim of unfair labor practice and it is within the exclusive jurisdiction of the NLRB. The Court agrees that "one of the available remedies [obtainable, the Court says, by court action] when a breach of the union's duty is proved" is "an order compelling arbitration." This is precisely and uniquely the kind of order which is within the province of the Board. Beyond this, the Court is exceedingly vague as to remedy: "appropriate damages or equitable relief" are suggested as possible remedies, apparently when arbitration is not available. Damages against the union, the Court admonishes, should be gauged "according to the damage caused by [its] fault"—*i. e.*, the failure to exhaust remedies for the grievance. The Court's difficulty, it seems to me, reflects the basic awkwardness of its position: It is attempting to force into the posture of a contract violation an alleged default of the union which is not a violation of the collective bargaining agreement but a breach of its separate and basic duty fairly

to represent all employees in the unit. This is an unfair labor practice, and should be treated as such.[4]

3. If we look beyond logic and precedent to the policy of the labor relations design which Congress has provided, court jurisdiction of this type of action seems anomalous and ill-advised. We are not dealing here with the interpretation of a contract or with an alleged breach of an employment agreement. As the Court in effect acknowledges, we are concerned with the subtleties of a union's statutory duty faithfully to represent employees in the unit, including those who may not be members of the union. The Court—regrettably, in my opinion—ventures to state judgments as to the metes and bounds of the reciprocal duties involved in the relationship between the union and the employee. In my opinion, this is precisely and especially the kind of judgment that Congress intended to entrust to the Board and which is well within the pre-emption doctrine that this Court has prudently stated.[5] See cases cited, *supra,* es-

---

[4] The Court argues that since the employee suing the employer for breach of the employment contract would have to show exhaustion of remedies under the contract, and since he would for this purpose have to show his demand on the union and, according to the Court, its wrongful failure to prosecute his grievance, the union could be joined as a party defendant; and since the union could be joined in such a suit, it may be sued independently of the employer. But this is a *non sequitur.* As the Court itself insists, the suit against the union is not for breach of the employment contract, but for violation of the duty fairly to represent the employee. This is an entirely different matter. It is a breach of statutory duty—an unfair labor practice—and not a breach of the employment contract.

[5] In a variety of contexts the NLRB concerns itself with the substantive bargaining behavior of the parties. For example: (a) the duty to bargain in good faith, see, *e. g., Fibreboard Corp.* v. *Labor Board,* 379 U. S. 203 (1964); (b) jurisdictional disputes, see, *e. g., Labor Board* v. *Radio Engineers,* 364 U. S. 573 (1961);

pecially the *Perko* and *Borden* cases, the facts of which strongly parallel the situation in this case. See also *Linn v. Plant Guard Workers*, 383 U. S. 53, 72 (1966) (dissenting opinion). The nuances of union-employee and union-employer relationships are infinite and consequential, particularly when the issue is as amorphous as whether the union was proved guilty of "arbitrary or bad-faith conduct" which the Court states as the standard applicable here. In all reason and in all good judgment, this jurisdiction should be left with the Board and not be placed in the courts, especially with the complex and necessarily confusing guidebook that the Court now publishes.

Accordingly, I join the judgment of reversal, but on the basis stated.

MR. JUSTICE BLACK, dissenting.

The Court today opens slightly the courthouse door to an employee's incidental claim against his union for breach of its duty of fair representation, only to shut it in his face when he seeks direct judicial relief for his underlying and more valuable breach-of-contract claim against his employer. This result follows from the Court's announcement in this case, involving an employee's suit against his union, of a new rule to govern an employee's suit against his employer. The rule is that before an employee can sue his employer under § 301 of the L. M. R. A. for a simple breach of his employment contract, the employee must prove not only that he attempted to exhaust his contractual remedies, but that his attempt to exhaust them was frustrated by "arbitrary, discriminatory, or . . . bad faith" conduct on

---

(c) secondary boycotts and hot cargo clauses, see, *e. g., Orange Belt District Council of Painters No. 48* v. *NLRB*, 117 U. S. App. D. C. 233, 328 F. 2d 534 (1964).

the part of his union.   With this new rule and its result I cannot agree.

The Court recognizes, as it must, that the jury in this case found at least that Benjamin Owens was fit for work, that his grievance against Swift was meritorious, and that Swift breached the collective bargaining agreement when it wrongfully discharged him.   The Court also notes in passing that Owens* has a separate action for breach of contract pending against Swift in the state courts.   And in Part IV of its opinion, the Court vigorously insists that "there is no reason to exempt the employer from contractual damages which he would otherwise have had to pay," that the "employee should have no difficulty recovering these damages from the employer" for his "unrelated breach of contract," and that "the employee [is] assured of direct recovery from the employer."   But this reassurance in Part IV gives no comfort to Owens, for Part IV is based on the assumption that the union breached its duty to Owens, an assumption which, in Part III of its opinion, the Court finds unsupported by the facts of this case. What this all means, though the Court does not expressly say it, is that Owens will be no more successful in his pending breach-of-contract action against Swift than he is here in his suit against the union.   For the Court makes it clear "that the question of whether a union has breached its duty of fair representation will . . . be a critical issue in a suit under L. M. R. A. § 301," that "the wrongfully discharged employee may bring an action against his employer" only if he "can prove that the union . . . breached its duty of fair representation in its handling of the employee's grievance," and "that the employee, as part and parcel of his § 301 action, finds

---

*Owens died while the appeal of his case from the trial court was pending.   The administrator of his estate was substituted and is the respondent herein though for simplicity is referred to herein as Owens.

it necessary to prove an unfair labor practice by the union." Thus, when Owens attempts to proceed with his pending breach-of-contract action against Swift, Swift will undoubtedly secure its prompt dismissal by pointing to the Court's conclusion here that the union has not breached its duty of fair representation. Thus, Owens, who now has obtained a judicial determination that he was wrongfully discharged, is left remediless, and Swift, having breached its contract, is allowed to hide behind, and is shielded by, the union's conduct. I simply fail to see how it should make one iota of difference, as far as the "unrelated breach of contract" by Swift is concerned, whether the union's conduct is wrongful or rightful. Neither precedent nor logic supports the Court's new announcement that it does.

Certainly, nothing in *Republic Steel Corp.* v. *Maddox,* 379 U. S. 650, supports this new rule. That was a case where the aggrieved employee attempted to "completely sidestep available grievance procedures in favor of a lawsuit." *Id.,* at 653. Noting that "it cannot be said . . . that contract grievance procedures are inadequate to protect the interests of an aggrieved employee until the employee has attempted to implement the procedures and found them so," *ibid.,* the Court there held that the employee "must *attempt* use of the contract grievance procedure," *id.,* at 652, and "must afford the union the opportunity to act on his behalf," *id.,* at 653. I dissented on the firm belief that an employee should be free to litigate his own lawsuit with his own lawyer in a court before a jury, rather than being forced to entrust his claim to a union which, even if it did agree to press it, would be required to submit it to arbitration. And even if, as the Court implied, "the worker would be allowed to sue after he had presented his claim to the union and after he had suffered the inevitable discouragement and delay which necessarily accompanies the union's refusal

to press his claim," *id.,* at 669, I could find no threat to peaceful labor relations or to the union's prestige in allowing an employee to by-pass completely contractual remedies in favor of a traditional breach-of-contract lawsuit for back pay or wage substitutes. Here, of course, Benjamin Owens did not "completely sidestep available grievance procedures in favor of a lawsuit." With complete respect for the union's authority and deference to the contract grievance procedures, he not only gave the union a chance to act on his behalf, but in every way possible tried to convince it that his claim was meritorious and should be carried through the fifth step to arbitration. In short, he did everything the Court's opinion in *Maddox* said he should do, and yet now the Court says so much is not enough.

In *Maddox,* I noted that the "cases really in point are those which involved agreements governed by the Railway Labor Act and which expressly refused to hold that a ·discharged worker must pursue collective bargaining grievance procedures before suing in a court for wrongful discharge. *Transcontinental & Western Air, Inc.* v. *Koppal,* 345 U. S. 653; *Moore* v. *Illinois Central R. Co.,* 312 U. S. 630." 379 U. S., at 666. I also observed that the Court's decision in *Maddox* "raised the overruling axe so high [over those cases] that its falling is just about as certain·as the changing of the seasons." *Id.,* at 667. · In the latter observation I was mistaken. The Court has this Term, in *Walker* v. *Southern R. Co.,* 385 U. S. 196, refused to overrule in light of *Maddox* such cases as *Moore* and *Koppal.* Noting the long delays attendant upon exhausting administrative remedies under the Railway Labor Act, the Court based this refusal on "[t]he contrast between the administrative remedy" available to Maddox and that available to Walker. If, as the Court suggested, the availability of an administrative remedy determines whether an employee can sue without first

exhausting it, can there be any doubt that Owens who had no administrative remedy should be as free to sue as Walker who had a slow one? Unlike Maddox, Owens attempted to implement the contract grievance procedures and found them inadequate. Today's decision, following in the wake of *Walker* v. *Southern R. Co.*, merely perpetuates an unfortunate anomaly created by *Maddox* in the law of labor relations.

The rule announced in *Maddox*, I thought, was a "brainchild" of the Court's recent preference for arbitration. But I am unable to ascribe any such genesis to today's rule, for arbitration is precisely what Owens sought and preferred. Today the Court holds that an employee with a meritorious claim has no absolute right to have it either litigated or arbitrated. Fearing that arbitrators would be overworked, the Court allows unions unilaterally to determine not to take a grievance to arbitration—the first step in the contract grievance procedure at which the claim would be presented to an impartial third party—as long as the union decisions are neither "arbitrary" nor "in bad faith." The Court derives this standard of conduct from a long line of cases holding that "[a] breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." What the Court overlooks is that those cases laid down this standard in the context of situations where the employee's sole or fundamental complaint was against the union. There was not the slightest hint in those cases that the same standard would apply where the employee's primary complaint was against his employer for breach of contract and where he only incidentally contended that the union's conduct prevented the adjudication, by either court or arbitrator, of the underlying grievance. If the Court here were satisfied with merely holding that in this situation the employee

could not recover damages from the union unless the union breached its duty of fair representation, then it would be one thing to say that the union did not do so in making a good-faith decision not to take the employee's grievance to arbitration. But if, as the Court goes on to hold, the employee cannot sue his employer for breach of contract unless his failure to exhaust contractual remedies is due to the union's breach of its duty of fair representation, then I am quite unwilling to say that the union's refusal to exhaust such remedies—however non-arbitrary—does not amount to a breach of its duty. Either the employee should be able to sue his employer for breach of contract after having attempted to exhaust his contractual remedies, or the union should have an absolute duty to exhaust contractual remedies on his behalf. The merits of an employee's grievance would thus be determined by either a jury or an arbitrator. Under today's decision it will never be determined by either.

And it should be clear that the Court's opinion goes much further than simply holding that an employee has no absolute right to have the union take his grievance to arbitration. Here, of course, the union supervised the grievance into the fourth step of the contract machinery and dropped it just prior to arbitration on its belief that the outcome of arbitration would be unfavorable. But limited only by the standard of arbitrariness, there was clearly no need for the union to go that far. Suppose, for instance, the union had a rule that it would not prosecute a grievance even to the first step unless the grievance were filed by the employee within 24 hours after it arose. Pursuant to this rule, the union might completely refuse to prosecute a grievance filed several days late. Thus, the employee, no matter how meritorious his grievance, would get absolutely nowhere. And unless he could prove that

the union's rule was arbitrary (a standard which no one can define), the employee would get absolutely no consideration of the merits of his grievance—either by a jury, an arbitrator, the employer, or by the union. The Court suggests three reasons for giving the union this almost unlimited discretion to deprive injured employees of all remedies for breach of contract. The first is that "frivolous grievances" will be ended prior to time-consuming and costly arbitration. But here no one, not even the union, suggests that Benjamin Owens' grievance was frivolous. The union decided not to take it to arbitration simply because the union doubted the chance of success. Even if this was a good-faith doubt, I think the union had the duty to present this contested, but serious, claim to the arbitrator whose very function is to decide such claims on the basis of what he believes to be right. Second, the Court says that allowing the union to settle grievances prior to arbitration will assure consistent treatment of "major problem areas in the interpretation of the collective bargaining contract." But can it be argued that whether Owens was "fit to work" presents a major problem in the interpretation of the collective bargaining agreement? The problem here was one of interpreting medical reports, not a collective bargaining agreement, and of evaluating other evidence of Owens' physical condition. I doubt whether consistency is either possible or desirable in determining whether a particular employee is able to perform a particular job. Finally, the Court suggests that its decision "furthers the interest of the union as statutory agent." I think this is the real reason for today's decision which entirely overlooks the interests of the injured employee, the only one who has anything to lose. Of course, anything which gives the union life and death power over those whom it is supposed to represent furthers its "interest." I simply fail to see how

the union's legitimate role as statutory agent is undermined by requiring it to prosecute all serious grievances to a conclusion or by allowing the injured employee to sue his employer after he has given the union a chance to act on his behalf.

Henceforth, in almost every § 301 breach-of-contract suit by an employee against an employer, the employee will have the additional burden of proving that the union acted arbitrarily or in bad faith. The Court never explains what is meant by this vague phrase or how trial judges are intelligently to translate it to a jury. Must the employee prove that the union in fact acted arbitrarily, or will it be sufficient to show that the employee's grievance was so meritorious that a reasonable union would not have refused to carry it to arbitration? Must the employee join the union in his § 301 suit against the employer, or must he join the employer in his unfair representation suit against the union? However these questions are answered, today's decision, requiring the individual employee to take on both the employer and the union in every suit against the employer and to prove not only that the employer breached its contract, but that the union acted arbitrarily, converts what would otherwise be a simple breach-of-contract action into a three-ring donnybrook. It puts an intolerable burden on employees with meritorious grievances and means they will frequently be left with no remedy. Today's decision, while giving the worker an ephemeral right to sue his union for breach of its duty of fair representation, creates insurmountable obstacles to block his far more valuable right to sue his employer for breach of the collective bargaining agreement.